1
2
3
4                    UNITED STATES DISTRICT COURT
5                   NORTHERN DISTRICT OF CALIFORNIA
6
7    TETRA TECH EC, INC.,                    Case No. 24-cv-06367-WHO
                     Plaintiff,
8
                                             ORDER ON THE MOTIONS FOR
9         v.                                 SUMMARY JUDGMENT
10   AIG SPECIALTY INSURANCE                 Re: Dkt. Nos. 63, 67, 68, 69, 79
     COMPANY,
11
                     Defendant.
12

13        The issue in the competing motions for summary judgment before me is whether defendant

14   AIG Specialty Insurance Company ("AIG") has (or had)[1] a duty to defend plaintiff Tetra Tech EC,

15   Inc. ("TtEC") or third-party Tetra Tech, Inc. ("TTI") (together, "Tetra Tech") in lawsuits

16   concerning Tetra Tech's environmental remediation work at the Hunters Point Naval Shipyard in

17   San Francisco.[2]  TtEC asserts claims for breach of contract, breach of the implied covenant of

18   good faith and fair dealing, and declaratory relief based on AIG's decision not to represent or to

19   withdraw representation of TtEC in two underlying lawsuits.  AIG, in turn, asserts counter claims

20   against TtEC and brings a third-party complaint against TTI seeking declaratory relief that it has

21   no duty to defend the parties in three underlying lawsuits.  AIG additionally seeks reimbursement

22   of defense costs from its partial defense of TtEC in one of the lawsuits.  AIG meets its burden to

23

24

25   _____
     [1] As of the date of this order, and as I explain further below, the lawsuits are in varying stages of
26   litigation.

27   [2] As AIG explains, the policies at issue contemplate a Self-Insured Retention model of claim
     expense coverage as opposed to a "duty to defend" in the traditional sense.  See Dkt. No. 77 at 5,
28   n.2.  For ease of reference, and to keep in line with the parties' choice of language, I use the term
     "duty to defend" throughout this Order.

show that no conceivable theory could raise an issue that would bring the underlying complaints within policy coverage because, as a result of Tetra Tech's fraudulent acts, the Pollution Conditions as defined in the policy were not unexpected or unintended.  AIG's Motion for Summary Judgment is GRANTED.  Tetra Tech's Motion for Summary Judgment is DENIED.

## BACKGROUND

### A.    AIG's Insurance Policies

TtEC is a corporation that provides environmental restoration and construction work to both private and government clients.  Second Amended Complaint ("TtEC SAC") [Dkt. No. 30] ¶ 5.  TtEC is a wholly owned subsidiary of third-party defendant, TTI.  AIG Second Amended Cross Complaint and Third Party Complaint ("AIG SACC") [Dkt. No. 47] ¶ 13; Tetra Tech Answer ("TT Answer") [Dkt. No. 52] ¶ 13.  From 2002 to 2022, Tetra Tech purchased insurance policies providing Contractor's Pollution Liability Coverage from AIG or a related entity.  TtEC SAC ¶¶ 7–8.  At issue in this case is the Contractor's Operations and Professional Services Environmental Policy ("the Policy") first issued on October 1, 2002, for a two-year term and subsequently renewed twice for annual terms—effective through October 1, 2006.[3]  TtEC SAC ¶ 8.

As relevant to this case, the Policy provided Tetra Tech with "CONTRACTOR'S POLLUTION LIABILITY."  Coverage B, the relevant provision, reads in full:

1. The company will pay on behalf of the **Insured, Loss** that the **Insured** is legally obligated to pay as a result of **Claims** for **Bodily Injury, Property Damage** or **Environmental Damage** caused by **Pollution Conditions** resulting from **Covered Operations.  The Pollution Conditions** must be unexpected and unintended from the standpoint of the **Insured.  The Bodily Injury, Property Damage,** or  **Environmental Damage** must occur during the **Policy Period.**

2. Progressive, indivisible **Bodily Injury, Property Damage** or **Environmental Damage**

---

[3] The parties have stipulated, and I have previously entered an Order granting the stipulation, to the authenticity of the Policy documents.  *See* Dkt. Nos. 61, 62.  For the purposes of the issue before me, the contents of the three policies are substantially similar, so I refer in large part only to the Policy issued on October 1, 2002.

> over a period of time caused by the same, related or continuous **Pollution Conditions** shall be deemed to have occurred only on the date of first exposure to such **Pollution Conditions**. However, if the date of first exposure is before the inception date of the first **Like Policy**, or can not be determined, but the progressive, indivisible **Bodily Injury**, **Property Damage** or **Environmental Damage** continues in fact to exist during the **Policy Period**, it will be deemed to have occurred only on the inception date of the first **Like Policy**.

Stipulation to Authenticity of Documents ("SAD"), Exh. A [Dkt. No. 61-1] at 2–3, Exh. B [Dkt. No. 61-2] at 5; Exh. C [Dkt. No. 61-3] at 4 (emphasis in original). The Policy defines several terms that are relevant to this case:

> **Bodily Injury** means physical injury, or sickness, disease, mental anguish or emotional distress sustained by any person, including death resulting therefrom.
> …
> **Claim** means a written demand received by an **Insured** seeking a remedy and alleging liability or responsibility on the part of the **Insured** for **Loss**. A **Claim** does not include **a Possible Claim** that has been reported under a prior policy but which has become a **Claim** during the **Policy Period** of this Policy . . .
> . . .
> **Covered Operations** means those activities performed at a job site by the **Insured** or others for whom the **Insured** is legally obligated.
> . . .
> **Environmental Damage** means physical damage to soil, surfacewater or groundwater, or plant or animal life, caused by **Pollution Conditions** and giving rise to **Clean-Up Costs**. **Environmental Damage** does not include **Property Damage**.
> . . .
> **Pollution Conditions** means the discharge, dispersal, release or escape of any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, medical waste and waste materials into or upon land, or any structure on land, the atmosphere or any watercourse or body of water, including groundwater, provided such conditions are not naturally present in the environment in the concentration or amounts discovered.

SAD. Exh. A at 12–15 (emphasis in original).

The Policy includes a number of exclusions, three of which are relevant in this case and to which I refer to as "Exclusion A," "Exclusion J," and "Exclusion S." *See* Exclusions [Dkt. No. 61-1] at 3–5, [Dkt. No. 61-2] at 6–8, [Dkt. No. 61-3] at 5–7 (detailing exclusions labeled "a-v"). The three exclusions pertinent to this case read:

This Policy does not provide coverage, and the Company will not pay **Loss** for:

> **A.**    1. Any **Claim** based upon or arising out of any fraudulent, criminal, or malicious

act or omission, or those of a knowingly wrongful nature committed intentionally by or at the direction of an **Insured;** or

2. Any **Claim** based upon or arising out of an **Insured's** knowing, willful or deliberate noncompliance with any statute, regulation, ordinance, administrative complaint, notice of violation, notice letter, executive order, or instruction of any governmental agency or body.

This exclusion shall not apply to an **Insured** who did not commit, participate in or have knowledge of such act, omission or noncompliance.

**J.**    Any **Claim** arising out of the cost to repair or replace faulty workmanship, assembly, construction, erection, fabrication, installation or remediation if such work is performed in whole or in part by:

1.  an **Insured;** or

2.  any organization, or subsidiary or affiliate thereof, which an **insured** controls, manages, operates or holds more than a 25% ownership interest in, or which controls, manages, operates or holds mor than a 25% ownership interest in an **Insured**.

**S.**    Any **Claim** in connection with any real property or facility which is, or was at any time, owned, operated or rented by the **Named Insured** or by any entity that:

1.  wholly or partly owns, operates, manages, or otherwise controls the **Named Insured;** or

2. is wholly or partly owned, operated, managed, or otherwise controlled by the **Named Insured**.

*See* Exclusions [Dkt. No. 61-1] at 3–5.

**B.    The Underlying Actions**

Each of the three underlying lawsuits is rooted in related facts.[4]  Bayview Hunters Point is

a neighborhood in southeast San Francisco that contains the Hunters Point Naval Shipyard, a

---

[4] Cites to the underlying case dockets are made in the following fashion: (1) *Bayview Hunters Point Residents v. Tetra Tech EC*, No. 3:19-cv-01417-JD ("*Bayview* Docket"); (2) *Abbey v. Tetra Tech EC*, No. 19-cv-07510-JD ("*Abbey* Docket"); (3) *USA ex rel Jahr v. Tetra Tech EC*, No. 13-cv-03835-JD ("*Jahr* Docket").  Both parties request that I take judicial notice of the complaints and answers filed in each of the cases.  *See* Dkt. Nos. 67, 69, 79.  AIG additionally requests judicial notice of judgments in two criminal matters concerning Tetra Tech supervisors.  *See* Dkt. No. 69, Exh. 10–11.  Judicial notice is GRANTED.  *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record.").

4

United States District Court
Northern District of California

military site that has been operated by the United States Navy in whole or in part since 1941 ("HPNS" or "the Site").  AIG SACC ¶¶ 18–19; TtEC SAC ¶ 15.  Starting in the 1940s, the Navy housed and maintained nuclear powered ships and radioactive weaponry at the Site.  TtEC SAC ¶ 15; *see Bayview* Docket No. 223 at 10 (explaining that HPNS "was the transit departure point for Little Boy, the atomic bomb that the United States dropped on the civilian population of Hiroshima, Japan, in August 1945").  The Navy established the Naval Radiological Defense Laboratory ("NRDL") at the Site in 1946.  AIG SACC ¶ 20; TtEC SAC ¶ 15.  The main purpose of the NRDL was to research and test the possibilities of radiation decontamination and the long-term impact of radiation and "radiation fallout on living organisms."  AIG SACC ¶ 20.

In 1989, as a result of the Navy's presence and activities at HPNS, the United States Environmental Protection Agency ("EPA") designated HPNS as a Superfund site pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").  AIG SACC ¶ 22.  This designation required the Navy to assess radiological and other contamination at the Site and to conduct cleanup and remediation efforts.  AIG SACC ¶¶ 22–23; TtEC SAC ¶ 16.

In 1994, the Navy entered into an agreement with the City and County of San Francisco that allowed the Navy to transfer parcels of the Site to San Francisco for use and redevelopment, subject to completion of the required remediation.  AIG SACC ¶ 24.  To comply with the remediation requirements, the Navy contracted with TtEC to perform radiological investigation and cleanup in January 2002.  TtEC SAC ¶ 17.  AIG alleges that the contract between TtEC and the Navy was fixed-in-price such that the Navy was required to pay TtEC a maximum amount— regardless of TtEC's ultimate cost of remediation.  AIG SACC ¶ 27.  TtEC worked on the Site until September 2015.  TtEC SAC ¶ 17.

Starting in 2012, several whistleblowers employed by Tetra Tech began to come forward with allegations that their supervisors had ordered them to submit falsified samples and fraudulent data to indicate that areas were clean of radiated materials and other dangerous pollutants although

they had *not* been successfully remediated. *Bayview* Docket No. 223 at 16. The Navy issued a preliminary report in January 2018 concluding that nearly half of the data provided by Tetra Tech concerning the HPNS remediation was flawed. *Id.* at 5. A later letter submitted by the local EPA manager of the Superfund Division stated that 97% of Tetra Tech's remediation data needed to be revisited. *Id.*

In March and May of 2018, Tetra Tech supervisors Justin Hubbard and Stephen Rolfe each pleaded guilty to one count in violation of 18 U.S.C. § 1519 (Destruction, alteration, or falsification of records in Federal investigations and bankruptcy). Request for Judicial Notice, Exhs. 10 and 11 [Dkt. No. 69] at 633–649. These revelations resulted in extensive media coverage and general community upset. The executive director of one advocacy group referred to the HPNS exposé as "the biggest case of eco-fraud in U.S. history." *Bayview* Docket No. 223 at 4.

As a result, a series of lawsuits were filed against Tetra Tech. I next describe the three lawsuits relevant to the motions before me.

### 1.    *Bayview Hunters Point Residents v. Tetra Tech* ("*Bayview*")

On May 1, 2018, Bayview Hunters Point Residents Danielle Carpenter, Catherine Muhammad, and 2,555 individuals filed a putative class action lawsuit against Tetra Tech and other defendants not at issue in this case. *See* Notice of Removal, *Bayview* Docket No. 1-1 at 68. TtEC removed the case to this court on March 18, 2019. *Id.* at Dkt. No. 1. The Bayview Class filed the operative complaint in that case, the Sixth Amended Complaint, against Tetra Tech on August 10, 2023. *Bayview* Docket No. 223; Request for Judicial Notice ("RJN") at Dkt. No. 69, Exh. 8 at 497–567 ("*Bayview* Complaint"). The number of individuals included in the suit now exceeds 7,000. *See* TtEC SAC ¶ 18; *Bayview* Dkt. Nos. 154, 254.

The *Bayview* Complaint alleges eleven causes of action, the following eight against Tetra Tech: (1) Negligence Fear of Cancer, *Bayview* Complaint ¶¶ 132–141; (2) Strict Liability for Ultrahazardous Activities, *Id.* at ¶¶ 142–148; (3) Violation of Proposition 65, *Id.* at ¶¶ 149–156;

6

(4) Negligence Per Se Criminal Convictions, *Id.* at ¶¶ 173–177; (5) Public Nuisance, *Id.* at ¶¶ 178–189; (6) Private Nuisance, *Id.* at ¶¶ 190–196; (7) Survival Action by Representatives and Successor in Interest, *Id.* at ¶¶ 197–201; and (8) Wrongful Death, *Id.* at ¶¶ 202–206.

Factually, the *Bayview* Complaint alleges that Tetra Tech's conduct, even for those allegations rooted in "negligence" on their face, was "deliberate, and undertaken with oppression, fraud or malice." *Bayview* Complaint ¶¶ 141, 148, 156, 172, 177, 189, 196, 201. Tetra Tech's fraudulent actions, the *Bayview* plaintiffs allege, resulted in plaintiffs suffering a detriment to their health, property values, and income; plaintiffs exist with a fear of developing cancers commonly associated with the pollutants left behind by the Navy and exacerbated by Tetra Tech's presence at HPNS.

### 2.    *Kevin Abbey v. Tetra Tech* (*"Abbey"*)

On November 14, 2019, Kevin Abbey filed a putative class action in this court on behalf of himself and three groups of plaintiffs, against Tetra Tech.[5] *Abbey* Docket No. 1. Abbey filed the operative complaint in that case, the First Amended Complaint, on February 28, 2020. *Abbey* Docket No. 40. The *Abbey* plaintiffs consist of current and former members of the San Francisco Police Department ("SFPD") and their spouses or surviving family members who were allegedly harmed by Tetra Tech's activities or omissions at the HPNS. RJN, Exh. 9 at 56–633 ("*Abbey* Complaint").

Similar to the *Bayview* Complaint, the *Abbey* Complaint alleges that Tetra Tech (and its predecessor corporations PRC Environmental Management, Inc. and Tetra Tech EM, Inc.) made fraudulent representations to the Navy and the City of San Francisco. *Abbey* Complaint ¶ 11. The *Abbey* Complaint broadly focuses on two timeframes of Tetra Tech's alleged behavior.

Specific to the allegations contained within the *Abbey* Complaint, the plaintiffs in *Abbey*

---

[5] *Abbey* was additionally filed against a third "Tetra Tech" entity, Tetra Tech EM, Inc.

United States District Court
Northern District of California

first allege that from 1996–1997, the Navy hired Tetra Tech to perform studies on a building and its surrounding property located in the HPNS ("the Building 606 Property") to determine whether it would be safe to lease to San Francisco as a facility for the SFPD. *Abbey* Complaint ¶ 10. Tetra Tech submitted a "Finding of Suitability to Lease" along with an environmental baseline survey informing the Navy that "there was no history of any radioactive substances at the Building 606 Property." *Id.* at ¶¶ 11, 13. The SFPD, relying on Tetra Tech's representations about the Building 606 Property, began using the area for hundreds of its employees. *Id.* at ¶ 15. The *Abbey* plaintiffs contend that those representations were not true.

More relevant here are the second set of allegations, in which the *Abbey* plaintiffs allege that from 2003–2014, Tetra Tech's remediation work, or, lack thereof, at the HPNS explained above resulted in significant physical, emotional, and financial harm to the SFPD employees housed and working at the Building 606 Property and to their spouses or surviving family members. *See Abbey* Complaint ¶¶ 233–239.

The *Abbey* Complaint alleges seven causes of action against Tetra Tech: (1) Negligent Undertaking, Negligent Misrepresentation, *Abbey* Complaint ¶¶ 208–239; (2) Public Nuisance, *Id.* at ¶¶ 240–248; (3) Racketeer Influenced and Corrupt Organization Act claims, *Id.* at ¶¶ 249–274; (4) Loss of Consortium, *Id.* at ¶¶ 275–278; (5) Wrongful Death, *Id.* at ¶¶ 279–285; (6) Negligent Infliction of Emotional Distress—Fear of Cancer, *Id.* at ¶¶ 286–294; and (7) Intentional Infliction of Emotional Distress, *Id.* at ¶¶ 295–298.

### 3.    *United States of America., ex rel. Arthur Jahr v. Tetra Tech EC* ("*Jahr*")

On August 19, 2013, Arthur R. Jahr along with other plaintiff relators filed a qui tam action in this court against Tetra Tech and other defendants.[6] *Jahr* Docket No. 1. In January 2019, the United States moved to intervene in *Jahr*, asserting False Claims Act and breach of

---

[6] I address the relevance of one of those defendants, New World Environmental, Inc. d/b/a New World Technology, later in this Order.

United States District Court
Northern District of California

contract claims, seeking damages related to Tetra Tech's work at HPNS. TtEC SAC ¶ 32; *Jahr* Docket No. 28. On August 16, 2023, the United States moved to file an amended complaint to include an action under CERCLA. *Jahr* Docket No. 342. On March 5, 2024, the Hon. James Donato granted the motion in an omnibus order. *Jahr* Docket No. 371. The operative Second Amended Complaint was filed against TtEC only on March 8, 2024. *Jahr* Docket No. 372 ("*Jahr* Complaint").

The *Jahr* Complaint largely alleges that TtEC knowingly and fraudulently failed to meet its contractual obligation with the Navy "to achieve 'free-release' of radiologically impacted areas by testing soil and buildings in those areas and remediating as necessary, until test results demonstrated that radiation levels were below applicable release criteria and regulatory limits." *Jahr* Complaint ¶ 4. Similar to those allegations raised in the *Bayview* and *Abbey* Complaints, the United States contends that instead of completing the work as contracted, TtEC misrepresented soil samples, manipulated data on building tests, and faked results ultimately submitted to the Navy so as to make it appear that hazardous sites were not so. *Jahr* Complaint ¶ 5. As for the CERCLA cause of action, the United States makes clear that as a result of TtEC's fraudulent actions, "the release or threatened release of radionuclides at the Site has caused the Navy to incur cleanup costs." *Jahr* Complaint ¶ 7. In the *Jahr* Complaint, the United States emphasizes that TtEC's fraudulent activity went far beyond what was already known following the guilty pleas of Tetra Tech supervisors Justin Hubbard and Stephen Rolfe. *Jahr* Complaint ¶ 103.

In its Second Amended Complaint, the United States alleges five causes of action against TtEC: (1) False Claims Act: Presentation of False Claims; *Jahr* Complaint ¶¶ 143–146; (2) False Claims Act: False Statement Material to a False Claim, *Id.* at ¶¶ 147–150; (3) Common Law Fraud, *Id.* at ¶¶ 151–156; (4) Breach of Contract, *Id.* at ¶¶ 157–160; and (5) CERCLA: Recovery of Response Costs, *Id.* at ¶¶ 161–178. The United States explains that the "CERCLA cause of action seeks recovery of costs currently being spent, as well as those costs that will be spent in the

9

future by the United States for this repeat response action addressing radionuclides at the Site." *Jahr* Complaint ¶ 2.

### C.  Tetra Tech's Communication With AIG

*Jahr* was the first of these three lawsuits filed, on August 19, 2013.  *Jahr* Docket No. 1. After the United States filed its Second Amended Complaint adding a CERCLA claim in August 2023, TtEC tendered the *Jahr* claim to AIG on November 9, 2023, seeking defense coverage on the added CERCLA claim.  TtEC SAC ¶ 36.  On February 7, 2024, AIG "conditionally agreed" to defend TtEC against the CERCLA claim pursuant to the October 2004–October 2005 Policy term only, reserving its right to withdraw should it later conclude there was no duty to defend. AIG SACC ¶¶ 75–78; TtEC SAC ¶37–40.  On October 4, 2024, AIG denied coverage for the *Jahr* claims against TtEC after concluding that there was no potential for coverage under the Policy and on account of Exclusion J – which precludes coverage for faulty workmanship.  AIG SACC ¶ 79; TtEC SAC ¶¶ 46–48.  AIG contends that it reimbursed TtEC some defense costs resulting from *Jahr* from November 9, 2023 to October 4, 2024.  AIG SACC ¶ 81.  *See* TtEC SAC ¶¶ 53–57 (asserting the AIG had failed to reimburse *any* expenses TtEC had incurred in *Jahr* as of the date of TtEC's filing of the Second Amended Complaint and that AIG only intended to reimburse TtEC at a reduced rate pursuant to, in TtEC's view, an inapplicable provision in the Policy); AIG Second Amended Answer [Dkt. No. 47] ¶ 54 (admitting AIG reserved its rights under that provision).

The *Bayview* lawsuit was first filed on May 1, 2018.  *Bayview* Docket No. 1.  In early 2019, TtEC tendered notice of the *Bayview* lawsuit to AIG pursuant to the Policy.  TtEC SAC ¶ 22.  On June 28, 2019, AIG denied coverage for the claims asserted against Tetra Tech in *Bayview*.  AIG SACC ¶ 82.  On March 29, 2024, TtEC requested that AIG reconsider its denial. TtEC SAC ¶ 41; AIG SACC ¶ 83.  On October 4, 2024, AIG refused.  TtEC SAC ¶ 42.  In AIG's view, the allegations presented in the *Bayview* complaint(s) do not come within Coverage B of

the Policy and/or one or more of the exclusions apply that preclude coverage under the Policy in any event.

*Abbey* was first filed on November 14, 2019. *Abbey* Docket No. 1. Tetra Tech first tendered the *Abbey* suit to AIG on May 8, 2024. AIG SACC ¶ 87. On October 4, 2024, AIG denied Tetra Tech coverage of *Abbey* for the same reasons it denied coverage of *Bayview*.

### D.  Procedural Background

On September 10, 2024, TtEC filed this suit, alleging breach of contract and tortious breach of the covenant of good faith and fair dealing claims and seeking declaratory relief. Dkt. No. 1; *see* TtEC SAC (asserting the same causes of action). In its SAC, TtEC asserts that AIG had a duty to defend it in both the *Bayview* and *Jahr* cases. AIG's Second Amended Counterclaim and Third Party Complaint seeks declaratory relief that it had no duty to defend or indemnify TtEC or TTI in *Bayview*, *Jahr*, or *Abbey*, and additionally seeks reimbursement for its defense costs as a result of its partial coverage of TtEC in the *Jahr* suit. At the January 15, 2025, Case Management Conference, I granted the parties' request to file dispositive motions solely on the duty to defend. *See* Dkt. Nos. 39, 42.

On April 30, 2025, the parties moved for summary judgment on the question of duty to defend. *See* Tetra Tech Motion for Summary Judgment ("TT MSJ") [Dkt. No. 63], AIG Motion for Summary Judgment ("AIG MSJ") [Dkt. No. 68]. The parties opposed each other's motions and replied in support of their own. *See* AIG Opposition to TT MSJ ("AIG Oppp. MSJ") [Dkt. No. 76], Tetra Tech Reply ISO its Motion for Summary Judgment ("TT Reply") [Dkt. No. 78]; Tetra Tech Opposition to AIG MSJ ("TT Oppo. MSJ") [Dkt. No. 74]; AIG Reply ISO its Motion for Summary Judgment ("AIG Reply") [Dkt. No. 77]. I held a hearing on the motions on June 4, 2025.[7] Dkt. No. 80.

---

[7] At the hearing, counsel for Tetra Tech in the underlying cases appeared and provided an update

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**LEGAL STANDARD**

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

Under California law, "[a]n insurer has a very broad duty to defend." *Anthem Elecs., Inc. v. Pacific Emp.'s Ins. Co.*, 302 F.3d 1049, 1054 (9th Cir. 2002). This broad duty entitles an insured "to a defense if the underlying complaint alleges the insured's liability for damages

---

concerning the current disposition of each of the cases. After reviewing each of the dockets for further updates, the cases are in the following disposition: *Bayview* is still in litigation, with a mandatory settlement conference set for September 15, 2025. Judge Donato entered a partial consent decree in *Jahr* as to the CERCLA claim and TtEC's CERCLA counterclaim only on July 2, 2025. *Jahr* Docket No. 503. *Abbey* has resolved, and Judge Donato dismissed the case with prejudice on May 5, 2025. *Abbey* Docket No. 288.

*potentially* covered under the policy, or if the complaint might be amended to give rise to a liability that would be covered under the policy." *Montrose Chem. Corp. v. Superior Ct.*, 6 Cal. 4th 287, 299 (1993).  But "the duty to defend, although broad, is not unlimited; it is measured by the nature and kinds of risks covered by the policy." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 19 (1995).

In determining whether a duty to defend exists, the following steps are available for a court to review.  First, an insured can "establish[] potential liability by reference to the factual allegations of the complaint, the terms of the policy, and any extrinsic evidence upon which the insured intends to rely." *Montrose Chem. Corp.*, 6 Cal. 4th at 299.  "[T]he extrinsic facts which may create a duty to defend must be *known by the insurer* at the *inception* of the third party lawsuit." *Gunderson v. Fire Ins. Exch.*, 37 Cal. App. 4th 1106, 1114 (1995) (emphasis in original).  These extrinsic facts "give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy." *Waller*, 11 Cal. 4th at 19.  Second, at that point, the "insurer must assume its duty to defend unless and until it can conclusively refute that potential." *Montrose Chem. Corp.*, 6 Cal. 4th at 299.  And, to be fully relieved of the duty to defend, the insurer must demonstrate that "the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage." *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 276 n.15 (1966).  An insurer may likewise rely on extrinsic evidence.  "Facts extrinsic to the complaint may also be examined and may . . . preclude the duty to defend.  Any doubt as to whether the facts give rise to a duty to defend is resolved in favor of the insured." *Albert v. Mid-Century Ins. Co.*, 236 Cal. App. 4th 1281, 1290 (2015) (internal citations omitted).

In Tetra Tech's view, at least some of the allegations included in each of the three underlying complaints bring coverage of the suits within AIG's duty to defend under the Coverage B provision of the Policy.  AIG first contends that none of the allegations are covered by the Policy, and additionally asserts that even were I to conclude that they are, each of the cases is

13

precluded from coverage because of one or more Policy exclusions. I first explain why I conclude the *Bayview* and *Abbey* cases rise and fall together and analyze whether the Policy requires AIG defend Tetra Tech in those suits. I next address *Jahr*. Finally, because I conclude that the allegations in the underlying complaints do not provide coverage under Coverage B, I need not address whether the Policy exclusions are applicable to any of the underlying cases. However, I briefly address two exclusions where I conclude that, even had the allegations met the requirements for coverage, AIG would have no duty to defend the underlying suits.

**I.      Whether the Underlying Cases Come Within the Terms of the Policy**

**A.      *Bayview* and *Abbey***

**i.      Consideration of the *Bayview* and *Abbey* Complaints**

As a preliminary matter, the *Abbey* case pertains to two separate timeframes, as discussed above. During the first timeframe, from 1996–1997, the *Abbey* plaintiffs allege that Tetra Tech's predecessor, PRC Environmental Management, Inc. submitted an erroneous "Finding of Suitability to Lease" along with an intentionally misleading environmental baseline survey to the government. *Abbey* Complaint ¶¶ 209–232. Tetra Tech does not argue that the allegations pertaining to the "alleged falsified Studies TtEC issued in 1996" bring the *Abbey* Complaint under AIG's duty to defend, only that the other allegations presented in the complaint do. TT Oppo. MSJ 12, n.2 (citing *Frontier Oil Corp. v. RLI Ins. Co.*, 153 Cal. App. 4th 1436, 1466 (2007) ("If a duty to defend arises, the insurer must defend the action in its entirety, including claims that are not potentially covered.")). For *Abbey*, then, this leaves open only the question of whether the allegations concerning Tetra Tech's remediation work from 2002 onward come within the meaning of Coverage B. And, if they do, whether the fraudulent allegations concerning that work fully encompass and therefore preclude coverage of any other claims made within the complaint.

This results in the *Abbey* complaint, for the purposes of the duty to defend analysis, to be somewhat indistinguishable from those claims raised in *Bayview*. To the extent that the claims in

14

*Abbey* are currently pleaded more so or less so with an understanding that the claims fall under Coverage B, the fact that either complaint could easily be amended to encompass the fullest version of the allegations necessarily means that if there exists a duty for AIG to defend Tetra Tech in *Abbey* it must likewise exist for *Bayview*, and vice versa. *See Montrose Chem. Corp. v. Superior Ct.*, 6 Cal. 4th at 299 ("[T]he insured is entitled to a defense if the underlying complaint alleges the insured's liability for damages *potentially* covered under the policy, or if the complaint might be amended to give rise to a liability that would be covered under the policy.") (emphasis in original).

ii.   Pollution Conditions must be  "unexpected and unintended"

The parties first dispute the meaning of the Policy language in Coverage B and whether it covers all claims rooted in negligent actions or, whether it more narrowly covers only accidental behavior.  If the former, as Tetra Tech contends, there exists some language throughout the *Bayview* and *Abbey* Complaints that warrants consideration on the duty to defend.  If the latter, as asserted by AIG, it seems clear that given the context of the Complaints, the allegations put forth by Tetra Tech as bringing *Bayview* and *Abbey* under Coverage B were not, as required, "unexpected and unintended."

To revisit, the Policy provides coverage of claims for "Bodily Injury, Property Damage or Environmental Damage caused by Pollution Conditions resulting from Covered Operations.  The Pollution Conditions must be *unexpected and unintended* from the standpoint of the Insured." SAD, Exh. A at 2 (emphasis added).  It is undisputed that the Navy's use of the HPNS resulted in a massive amount of pollution, including radiological contamination of the soil, water, and buildings at the Site.  The question in this case is whether the allegations presented in the *Bayview* and *Abbey* Complaints indicate that Tetra Tech's subsequent activities during its remediation work (i.e. the "Covered Conditions" as defined by the Policy) resulted in Pollution Conditions that were "unexpected and unintended" from Tetra Tech's standpoint.

Tetra Tech largely argues that along with allegations of intentional and fraudulent conduct, the *Bayview* Complaint "also alleges negligent conduct and specifically includes claims for damages against Tetra Tech sounding in 'negligence fear of cancer,' and 'negligence per se.'" TT MSJ 21. These negligence claims, it says, create at least a "remote possibility" that AIG had a duty to defend, because any negligence claims or factual allegations refer to "consequences of [intentional conduct]" where "the resulting Pollution Conditions . . . are unintended from the standpoint of" Tetra Tech.[8] *Id.* at 21, 25.

AIG concedes that "[a]lthough each lawsuit details TtEC's intentional and fraudulent conduct, each of the lawsuits also contains negligence references, to one degree or another." AIG MSJ 20. But, in AIG's view, "[i]n the insurance context, the phrase 'unexpected and unintended' is interchangeable with the term 'accident.'" AIG MSJ 16 ( citing *Fire Ins. Exch. v. Superior Ct.*, 181 Cal. App. 4th 388, 392 (2010) ("'Accident' is given a commonsense interpretation that it is an unintentional, unexpected, chance occurrence.")). "An accident does not occur when the insured performs a deliberate act unless some additional, unexpected, independent, and unforeseen happening occurs that produces the damage." *Fire Ins. Exchange*, 181 Cal. App. 4th at 392. AIG cites further to *AIU Insurance Company v. McKesson Corporation* for the proposition that "'Negligence' is not synonymous with 'accident' because a claim for negligence may be based on alleged deliberate conduct that presents an unreasonable risk of foreseeable harm." 598 F. Supp. 3d 774, 794 (N.D. Cal. 2022) (J. Corley), *aff'd*, No. 22-16158, 2024 WL 302182 (9th Cir. Jan. 26, 2024). Therefore, AIG contends, none of the alleged Pollution Conditions "*i.e.*, contaminated soil TtEC left in place or moved around the Site . . . were unexpected or unintended because they resulted from [Tetra Tech's] fraudulent sampling and testing, as well as intentional dumping of

---

[8] Tetra Tech repeatedly contends that its actions at the Site "were 'intentional' in the sense that Tetra Tech intended to test and remediate soil, and to backfill trenches at the Site with soil that it believed was clean." TT Oppo. MSJ 15.

contaminated soil in trenches."  AIG MSJ 21.

Tetra Tech responds that AIG's dependance upon caselaw concerning commercial general liability (or "CGL") policies is inapt because while standard CGL policies limit liability coverage for damage caused by an "occurrence," defined as an "accident," "the AIG Policies contain no such requirement."  TT Oppo. MSJ 14–15 (emphasis removed).  Instead of limiting coverage of conduct that results in an "accident," the policies instead only cover instances wherein the Pollution Conditions themselves are "unexpected and unintended from the standpoint of the insured."  TT Oppo. MSJ 15.  Coverage B itself does not require or preclude any specific "conduct" on behalf of the insured.  Tetra Tech does not offer any caselaw in support of its contention that contractual definitions from CGL policies would not transfer to other insurance policies.  But, AIG has cited to cases that define "accident" as the result of an "unexpected and unintended" occurrence or event—that is not quite the same as using "accident" and "unexpected and unintended" interchangeably, as it asserts.  *See* AIG MSJ 16–17.  However, it is a distinction without a difference.

Even ignoring AIG's semantics arguments and focusing only on the plain language of the policy, Tetra Tech is wrong.  *See MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648 (2003) (explaining that insurance policy provisions are to be interpreted in their "ordinary and popular sense" unless some technical or special meaning is ascribed).

Tetra Tech argues:

> According to the HPNS Lawsuits' allegations, Tetra Tech's alleged placement of contaminated soils that were "mislabeled, untested or inaccurately tested" as fill on the Site resulted in unexpected and unintended Pollution Conditions because Tetra Tech did not know or believe when it used the soils as fill that a Pollution Condition (release of contaminants) would occur; Tetra Tech believed the soils were clean.

TT Oppo. MSJ 17.  That is not what either the *Bayview* or *Abbey* Complaints allege.  Below, I include a chart that includes language from both complaints.  On the left side, I present the allegations cited to by Tetra Tech in its Motion for Summary Judgment, and/or in Opposition to

United States District Court
Northern District of California

AIG's Motion for Summary Judgment.  On the right, I include the full text of the complaint language.

| *Bayview* Complaint | |
|---|---|
| **Allegation as Quoted by Tetra Tech** | **Context from Complaint** |
| "remediat[ed] radioactive material in soil improperly, resulting in potentially radioactively contaminated soil being shipped offsite as well as being used as backfill for trenches at the Shipyard."  TT Oppo. MSJ 11. | "Tetra Tech employees and the radiological subcontractors directly supervised were involved in at least *six types of fraud* that are discussed in detail in this supplemental disclosure: . . . (5) remediating radioactive material in soil improperly, resulting in potentially radioactively-contaminated soil being shipped offsite as well as being used as backfill for trenches at the Shipyard."  *Bayview* Complaint ¶ 64 (emphasis added). |
| "While the *Bayview* complaint alleges intentional and fraudulent conduct, it also alleges negligent conduct and specifically includes claims for damages against Tetra Tech sounding in 'negligence fear of cancer,' and 'negligence per se.'  TT MSJ 21. | Both the *Bayview* Complaint's first cause of action for "Negligence Fear of Cancer" and the fifth cause of action for "Negligence per Se" conclude with the following provision: "Tetra Tech Defendants' misconduct was *deliberate*, and *undertaken with oppression, fraud*, or *malice* with the meaning of California Civil Code § 3294, justifying an award of exemplary damages sufficient to punish Defendants and to deter them from such misconduct in the future."  *Bayview* Complaint ¶¶ 141, 177. |
| *Abbey* Complaint | |
| **Allegation as Quoted by Tetra Tech** | **Context from Complaint** |
| "Tetra Tech failed to secure truckloads of contaminated soils, so that the soil dropped on roadways and became airborne; dumped contaminated soil in unsecured piles; and created extensive soil disruption which forced plaintiffs to inhale contaminated airborne particulate matter. Plaintiffs allege that 'as a result' of these 'negligent and reckless acts and omissions . . . Plaintiffs were exposed, via numerous exposure pathways, to multiple hazardous substances at HPNS."  TT Oppo. MSJ 13. | Prior to the allegations cited by Tetra Tech, the *Abbey* Complaint explains: "In addition, *as a result of its own fraudulent testing and fraudulent reporting*, Tetra Tech processed soil and materials that it *knew or suspected were contaminated and potentially injurious to humans*, handling such soil and materials as if they were clean, without taking safety precautions to protect the lives and safety of Plaintiffs who were working at HPNS."  *Abbey* Complaint ¶ 25. |
| "Tetra Tech moved 'thousands of truckloads of contaminated soil … in such a manner that the soil dropped onto roadways used by [plaintiffs] | Just before these allegations, the *Abbey* Complaint explains: "At all relevant times, Tetra Tech negligently and fraudulently |

United States District Court
Northern District of California

| | |
|---|---|
| was retained by vehicles, and became airborne as contaminated particles inhaled, ingested, and dermally contacted by [plaintiffs]." TT Oppo. MSJ 13. | performed its Remediation Contracts at HPNS, *intentionally concealing* the true extent of contamination at HPNS. Because Tetra Tech *fraudulently concealed the true extent of contamination at HPNS*, it processed contaminated soil as if it were clean soil, thereby bypassing safety protections and causing Group A Plaintiffs' and Group C Decedents' exposure to hazardous substances from throughout the base." *Abbey* Complaint ¶¶ 135–136. |
| "Tetra Tech 'us[ed] contaminated soils as backfill, and plac[ed] it in piles near Building 606, in such a manner that contaminated particles became airborne and were inhaled, ingested, and dermally contacted by [plaintiffs].'" TT Oppo. MSJ 13. | Same |
| "A fire burned during remediation activities, which created smoke for at least one month, resulting in the release of multiple irritants and contaminants, including methane gas, arsenic, chloroform, trichloroethylene, tetrachloroethylene, benzene, and vinyl chloride, which the *Abbey* plaintiffs inhaled and caused them harm. TT Oppo. MSJ 13. | This paragraph of the *Abbey* Complaint refers to a 14-acre landfill fire that "burned for at least six hours" after which "[s]everal areas of landfill continued to smolder, creating smoke, for at least one month." *Abbey* Complaint ¶ 202. The initial fire took place on August 16, 2000, which is outside of the covered policy period. |
| "Claimants complained regarding dust levels during Tetra Tech's remediation activities, which plaintiffs carried home on their personal vehicles and clothing, and was inhaled, ingested, and dermally contacted causing them injury." TT Oppo. MSJ 13–14. | The *Abbey* Complaint reads in full: "During remediation activities, the levels of airborne particulate matter (dust) became so severe that Group A Plaintiffs and Group C Decedents complained regarding dust levels, and were awarded free car washes for their vehicles. However, *Tetra Tech continued to reassure Plaintiffs that the dust*, which Plaintiffs carried home on their personal vehicles and clothing, *was non-hazardous and did not present any health risk. This was untrue,* and the particulate matter that Group A Plaintiffs and Group C Decedents inadvertently inhaled, ingested and dermally contacted was hazardous and caused them injury." *Abbey* Complaint ¶ 203. |

Each of these allegations support an understanding that any alleged "negligence" that occurred was done solely in pursuit of alleged fraud or could only be found to be negligent as a direct result of fraud. For example, the *Abbey* Complaint's allegation that Tetra Tech's acts were

"negligent and reckless" are only because Tetra Tech treated hazardous soil as clean—something Tetra Tech did as a direct result of the fraud it perpetrated in purposely mislabeling the soil. The question is not, therefore, whether Tetra Tech acted 'negligently.' The question is whether the allegations posit that from the standpoint of the Insured, here Tetra Tech, were the Pollution Conditions "unexpected or unintended." Because the allegations state that Tetra Tech committed fraud by claiming hazardous soil was clean when it was not, and then treated that hazardous soil as if it were clean, the answer is no.[9]

There is no dispute of material fact that the *Bayview* and *Abbey* Complaints allege that Tetra Tech's actions leading to the Pollution Conditions *were* at the very least an expected outcome as the result of its fraudulent activity. Neither Complaint alleges potentially covered claims.

### B.    *Jahr*

*Jahr* faces a similar fate.

There is no dispute that Tetra Tech initially sought coverage for its defense in *Jahr* only as a result of the United States' 2023 addition of a CERCLA cause of action to the *Jahr* Complaint. In its summary judgment briefing, however, Tetra Tech alleges that the *Jahr* Complaint's breach of contract claim also "triggers AIG's defense obligation" because of the alleged environmental damages that occurred during the period of Tetra Tech's contract with the Navy.[10]  TT Oppo. MSJ

---

[9] I briefly note that were I to adopt Tetra Tech's interpretation of what encompasses an insurer's duty to defend, that would ultimately require insurers to provide litigation coverage to those who commit fraud, but do so negligently. That makes no sense given the long-held understanding that insurers do not cover fraud, as this would only serve to incentivize such conduct.

[10] AIG remarks in a footnote that it was not until the briefing of these motions that Tetra Tech first asserted a duty to defend triggered by the contract claims in *Jahr*, and Tetra Tech did so in footnote. AIG Oppo. MSJ 26–27, n.5; *see* TT MSJ 27, n.6 ("The CERCLA claim is not the only claim in *Jahr* that triggers AIG's defense obligation. The government's breach of contract claim also triggers AIG's defense obligation."). In its motion, Tetra Tech only substantively addresses its position that the CERCLA claims give rise to a duty to defend. It raises specific contractual provisions only in its opposition to AIG's motion. *See* TT Oppo. MSJ 8–10. I am persuaded that Tetra Tech has waived any argument that the allegations of breach of contract give rise to

United States District Court
Northern District of California

9; TT MSJ 26, 27 n.6.  Tetra Tech contends that allegations throughout the *Jahr* Complaint bring the case within AIG's duty to defend.  For ease of review, I include each reference Tetra Tech has made to the *Jahr* allegations in support of its arguments below.  I next explain why these allegations, when read within their full context, do not require AIG to defend TtEC in *Jahr*.

| *Jahr* Complaint |
|---|
| **Allegations as Quoted by Tetra Tech re: Breach of Contract** |
| "By running the conveyor belt at a high speed, Tetra Tech prevented the scanner from detecting levels of contamination."  TT Oppo. MSJ 9 (*Jahr* Complaint ¶ 70). |
| "Even though the scanner could not, at times, identify the presence of contamination, upon information and belief, Tetra Tech proceeded as if the scanner had reliably identified some soils as clean.  TT Oppo."  MSJ 9 (*Jahr* Complaint ¶ 71). |
| "By moving soils from one part of the Site to another without properly testing those soils, Tetra Tech deposited radionuclides at the Site, upon information and belief."  TT Oppo. MSJ 9 (*Jahr* Complaint ¶ 72). |
| "Tetra Tech's placement of contaminated samples into open trenches, its unreliable sampling and analysis, and its use of unreliably tested soils as fill at the Site resulted in radionuclides coming to be located at the Site and required the Navy to undertake a second investigation and cleanup . . . ."  TT Oppo. MSJ 9 (*Jahr* Complaint ¶ 73). |
| "Each of the Relevant Contracts required Tetra Tech to perform soil and building surveys in accordance with contractual specifications.  Based on the actions described above, Tetra Tech breached the Relevant Contracts by falsifying soil samples, falsifying building scan data, and failing to perform full, complete, and accurate investigations of radiological contamination, and failing to remediate where necessary to achieve free release."  TT Oppo. MSJ 10 (*Jahr* Complaint ¶ 124). |
| "Because of Tetra Tech's breaches of contract in investigating the radiological contamination at Hunters Point, the Navy must pay other contractors to re-test the soil and buildings in the Parcels where Tetra Tech worked in order to determine where clean up activities are required.  The Navy will also have to pay for any further cleanup activities."  TT Oppo. MSJ 10 (*Jahr* Complaint ¶ 139). |
| **Allegations as Quoted by Tetra Tech re: CERCLA** |
| "In fact, the CERCLA claim explicitly alleges that TtEC's conduct was 'negligent' or 'grossly negligent.'"  TT Oppo. MSJ 9. |
| "This action also concerns Tetra Tech's liability pursuant to Section 107(a) of CERCLA for costs incurred by the United States to address the release or threat of release of hazardous substances at the Site.  Tetra Tech's unreliable sampling and other activities at the Site left the Navy under a legal obligation to re-do the work at those portions of the Site where Tetra Tech had previously been performing the radiological waste response activities."  *Jahr* Complaint ¶ 2 (June 4, 2025 Hearing Transcript ("Transcript") at 18:25–19:2. |
| "Tetra Tech employees mislabeled or misidentified the location from which samples were taken, misreported results and ran scanners in a manner that would result in inaccurate results."  *Jahr* |

coverage pursuant to the policies on their own, but, for fullness sake, I address all claims below. *See Est. of Saunders v. Comm'r of Internal Revenue*, 745 F.3d 953, 962 n.8 (9th Cir. 2014) (holding "[a]rguments raised only in footnotes, or only on reply, are generally deemed waived").

| |
|---|
| Complaint ¶ 34, Transcript at 19:3. |
| "The agencies stated that the data 'demonstrate a pattern of practices that appear to show deliberate falsification, failure to perform the work in a manner required to ensure Record of Decision (ROD) requirements were met, or both.'" *Jahr* Complaint ¶ 113, Transcript at 19:8. |
| "As described above, Tetra Tech analyzed soil samples in a manner that would not provide accurate information, and reported sampling results in an unreliable manner, identifying the samples as clean." *Jahr* Complaint ¶ 170; Transcript at 19:15. |
| "As described above, Tetra Tech was permitted to use clean samples as fill on the Site, but the soil Tetra Tech identified as clean included some soil that was either mislabeled, untested or inaccurately tested; and also as described above, Tetra Tech encouraged activities on the Site to minimize the amount of clean up expenses; therefore, upon information and belief, Tetra Tech used some soils containing hazardous substances as fill on the Site and deposited some soils containing hazardous substances into open trenches on site." *Jahr* Complaint ¶ 171; Transcript at 19:15. |
| **Other Allegations** |
| "the government alleges that TtEC 'mislabeled' and 'inaccurately tested' soils, allegedly resulting in contaminated soils being used as fill at HPNS."  TT Oppo. MSJ 9. |

As before, for the duty to defend to take hold, the *Jahr* Complaint must allege Pollution Conditions that are "unexpected or unintended" from TtEC's perspective.  The allegations, understood in their full context, establish the opposite understanding.  Beginning with the contract claims in *Jahr*, it is clear from the outset of the *Jahr* Complaint that the allegations against TtEC are rooted in actions that would lead to, at the very least, expected Pollution Conditions.  By way of introduction, the *Jahr* Complaint reads: "As detailed below, Tetra Tech violated the False Claims Act *and breached its contracts with the Navy by*: (1) misrepresenting the sources of soil samples submitted to the laboratory for testing; (2) manipulating data from radiological testing of buildings; and (3) reporting false results from the radiological soil and building tests." *Jahr* Complaint ¶ 5 (emphasis added).  With this added context, it becomes clear that the allegations listed above concerning TtEC's alleged contractual breaches are alleged to be *purposeful* actions. TtEC "running the conveyor belt at high speed" or "moving soils from one part of the Site to another without properly testing those soils" were not simply negligent acts of oversight, as Tetra Tech argues.  *Jahr* Complaint ¶¶ 70, 72; *see* TT MSJ 26–27.  They were purposeful actions taken by TtEC employees under the direction of TtEC supervisors so that TtEC could successfully evade

22

the costs associated with having to actually remediate the soil.  So, any downstream negative effects, i.e. Pollution Conditions, legally must have been expected or intended by TtEC.  *Cf. AIU Ins. Co.*, 598 F. Supp. at 793 ("[T]he core distinction between negligence and intentional torts is whether the conduct was done with the purpose of causing harm or with a certainty that harm would result, not whether the conduct was deliberate.").

In *Jahr*, the United States also alleges a claim pursuant to CERCLA.  As TtEC acknowledges, liability under CERCLA attaches when:

> "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities . . or sites . . . from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.
> . . .
> **(1)  Response action contractors**
> A person who is a response action contractor with respect to any release or threatened release of a hazardous substance or pollutant or contaminant from a vessel or facility shall not be liable under this subchapter or under any other Federal law to any person for injuries, costs, damages, expenses, or other liability . . . which results from such release or threatened release.
> **(2)  Negligence, etc.**
> Paragraph (1) shall not apply in the case of a release that is caused by conduct of the response action contractor which is negligent, grossly negligent, or which constitutes intentional misconduct.

42 U.S.C. §§ 9607(a)(4), 9619(a)(1)-(2).

TtEC's arguments that AIG has a duty to defend given the allegations related to the CERCLA claim again fail because the *Jahr* Complaint alleges intentional or knowing conduct that can only result in expected or intended Pollution Conditions.  For example, Tetra Tech argues that the *Jahr* Complaint's allegation that "Tetra Tech employees mislabeled or misidentified the location from which samples were taken, misreported results and ran scanners in a manner that would result in inaccurate results" gives rise to a duty to defend.  *Jahr* Complaint ¶ 34.  Tetra Tech maintains that this language suggests "that the Pollution Conditions at HPNS were unexpected and unintended from the standpoint of TtEC."  TtEC MSJ 26.  It is difficult to see how.  The full context of that allegation reads:

> During the process of site investigation, Tetra Tech engaged in the process of surveying and sampling, described more fully below, some of which would appear to minimize the amount of hazardous substances found, rather than to accurately characterize and address the radionuclides on the Site. Tetra Tech employees mislabeled or misidentified the location from which samples were taken, misreported results and ran scanners in a manner that would result in inaccurate results.

*Jahr* Complaint ¶ 34. It is clear from the full context of the allegation that the *Jahr* Complaint alleges intentional conduct—TtEC employees did not merely "mislabel" or "misidentify" soil sample locations in the sense that it was accidental, negligent, or without the intent to do so. This was, again, purposeful conduct that had foreseeable, expected, outcomes. Similarly, the allegation that TtEC's actions showed "deliberate falsification of data, failure to perform the work in a manner required to ensure Record of Decision (ROD) requirements were met, or both" indicate purposeful data manipulation and purposeful shoddy work—all in the service of TtEC's alleged ultimate desire to expend as little money as possible and preserve as much of its funds from the Navy contract. *Jahr* Complaint ¶ 113.

TtEC finally points to the *Jahr* Complaint's use of the terms "negligent" and "grossly negligent" as a reason for why AIG has a duty to defend. As I have already explained, a mere allegation of negligence is not enough, in itself, to require an insurer to defend. *See*, *supra* n.8. Further, the full language of that allegation reads: "Tetra Tech is not protected from liability as a Response Action Contractor because the conduct of Tetra Tech through its corporate managers and employees was negligent, grossly negligent or constitutes intentional misconduct, within the meaning of 42 U.S.C. § 9619(a)(2)." *Jahr* Complaint ¶ 173. This "general boilerplate pleading of 'negligence'" (and 'gross negligence') "adds nothing to [the] complaint otherwise devoid of *facts* giving rise to a potential for covered liability." *Gonzalez v. Fire Ins. Exch.*, 234 Cal. App. 4th 1220, 1235 (2015) (emphasis in original). Because the entirety of the complaint is focused on TtEC's alleged intentional conduct that could only result in expected and/or intended Pollution Conditions, there is no dispute of material fact that AIG has no duty to defend TtEC in *Jahr*.

United States District Court
Northern District of California

## II.    Whether Any Exclusion Applies

Though I have concluded that the Complaints do not fall within AIG's duty to defend, I also address two Policy exclusions that, had I concluded otherwise, would have precluded establishing a duty to defend in any event and a third raised by AIG in support of its Motion.

"Although insuring clauses normally are interpreted broadly and exclusions strictly are construed, where an exclusion is clear and unambiguous, it is given its literal effect." *Westoil Terminals Co., Inc. v. Industrial Indemnity Co.*, 110 Cal. App. 4th 139, 146 (2003) (internal citations omitted).  The burden of proof "is on the insurer to prove a claim covered falls within an exclusion."[11]  *Royal Globe Ins. Co. v. Whitaker*, 181 Cal. App. 3d 532, 537 (1986).

---

[11] Tetra Tech repeatedly contends that because it denies the allegations in the Complaints and those allegations are therefore unproven, AIG has a duty to defend despite any exclusion upon which it wishes to rely.  That is not so.  Tetra Tech cites to *KM Strategic Management, LLC v. American Casualty Company of Reading PA* for the proposition that "an insurer does not meet its burden of establishing an exclusion's application by pointing to unproven and disputed allegations in the very complaint it is called upon to defend."  156 F. Supp. 3d 1154, 1170 (C.D. Cal. 2015).  In that case, the court held three policy exclusions did not preclude the insurers duty to defend.  *Id.* at 1170–1172.  The relevant exclusions in that policy state: "This insurance does not apply to: . . . (p.) Personal and advertising injury: (1) Caused by or at the direction of the insured with the knowledge that the act . . . would inflict 'personal and advertising injury,' (2) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity; . . . (4) Arising out of a criminal act committed by or at the direction of any insured; . . . [or] (6) Arising out of a breach of contract."  Notice of Motion and Motion for Partial Summary Judgment as to American Casualty's Duty to Defend, *KM Strategic Mgmt., LLC v. Am. Cas. Co. of Reading PA*, No. 5:15-cv-01869-CAS-kk (C.D. Cal. 2015), Dkt. No. 12-6 at 34–35.

The insurance policies at issue in this case exclude a much broader swath of coverage.  Unlike in *KM Strategic Management* which preclude coverage for actual injury rooted in specified conduct, the policies here exclude "Any **Claim** based upon [the listed conduct]."  *See* Dkt. No. 61-1 at 3–5.  The court in *KM Strategic Management* contemplates the possibility of a broadly defined exclusion.  *See KM Strategic Mgmt., LLC*, 156 F. Supp. 3d at 1171 ("Importantly, the exclusion could have been written more broadly so as to cover all claims for injury arising out of any 'alleged' breach of contract.").

Further, Tetra Tech's reliance on *Montrose Chemical Corporation* is inapt.  That case concerned a policy that "promised to defend [plaintiff] against 'any suit . . . seeking damages on account of bodily injury or property damage, even if any of the allegations of the suit are groundless, false, or fraudulent.'"  6 Cal. 4th 287, 292 (1993).  Although the instant policies in their original form contained a similar clause, *see* Dkt. No. 61-1 at 3, Dkt. No. 61-2 at 6, Dkt. No. 61-3 at 5, each of these clauses were fully removed by endorsements (amendments) to the policies.  *See* Dkt. No. 61-1 at 24–26, Dkt. No. 61-2 at 26–27, Dkt. No. 61-3 at 21–22.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

United States District Court
Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.    Exclusion A

Even if the complaints had fallen under Coverage B of the policies, Exclusion A would apply to each of the three underlying cases.  In pertinent part, it excludes coverage for "[a]ny Claim based upon or arising out of any fraudulent, criminal, or malicious act or omission, or those of a knowingly wrongful nature committed intentionally by or at the direction of an Insured." Exclusions [Dkt. No. 61-1] at 3.  "California courts have interpreted the terms 'arising out of' or 'arising from' broadly:  'It is settled that this language does not import any particular standard of causation or theory of liability into an insurance policy.  Rather, it broadly links a factual situation with the event creating liability, and connotes only a minimal causal connection or incidental relationship." *The Travelers Prop. Casualty Co. of America v. Actavis, Inc.*, 16 Cal. App. 5th 1026, 1045 (2017) (citation omitted).  Further, "[t]his broad interpretation of 'arising out of' applies to both coverage provisions and exclusions." *Id.*  For the reasons I have already explained at length above, *Abbey*, *Bayview*, and *Jahr* all include allegations that solely "arise out of" Tetra Tech's alleged actions that were of a "knowingly wrongful nature committed intentionally by or at the direction" of Tetra Tech.  Exlusions [Dkt. No. 61-1] at 3.

I next respond to AIG's mention of and request for judicial notice of documents pertaining to the 2018 criminal convictions of Stephen Rolfe and Justin Hubbard, both former Tetra Tech supervisors.  Although the convictions add color to the overall background of the case, neither bears directly on my conclusion that Exclusion A applies to the underlying cases.  As explained in the *Bayview* Complaint and reflected on by counsel for Tetra Tech at the hearing, Mr. Hubbard and Mr. Rolfe pleaded guilty to criminally fraudulent conduct starting in 2012.  *Bayview* Complaint ¶¶ 105–106; Hearing Transcript at 15:12–15; *see also Jahr* Complaint ¶ 89 ("From 2009 to 2012, Steven Rolfe directed [Radiological Control Technician] Anthony Smith to take fake soil samples.").  Those admissions fall outside of the policy coverage dates.  *See* Policies [Dkt. No. 61] (explaining coverage from the policies extended from October 1, 2002–October 1,

26

2006).

That said, each complaint clearly alleges fraudulent or otherwise applicable activity that falls within the policy coverage periods.  For example, the *Abbey* Complaint states:

> From 1992-2014, while Tetra Tech was performing testing and remediation at HPNS, it was under increasing pressure to reduce the time and expense of the project, The Navy's contracts with Tetra Tech provided financial incentives for performing work quickly and efficiently.  Some of the contracts had budget caps built in, and others were fixed price, requiring Tetra Tech to bear the expense if its test results showed more contamination than expected.  Initial estimates regarding the scope, duration, and expense of the HPNS remediation proved to be inaccurate.  Whereas the Navy originally anticipated that it would be able to fully remediate HPNS, and then sell it to the City, within a handful of years, the remediation work has now been ongoing for 28 years.
>
> In an effort to save time and cost, **from 1997 to 2014**, Tetra Tech fraudulently performed its testing and remediation work.  Its fraud included swapping out contaminated samples for clean samples, running scanning belts at high speeds, watering down soil to block detection of radioactivity, destroying test results at its on-site laboratory, and reducing the sensitivity of its test instruments.  Tetra Tech's fraudulent activity resulted in two criminal convictions of Tetra Tech employees, as well as a False Claims Act lawsuit brought by the Navy, and former Tetra Tech employees (the whistleblowers or relators) against Tetra Tech.
>
> By virtue of its fraudulent testing, **from 1997 to 2014**, Tetra Tech concealed from the Navy, the City, and Plaintiffs the actual extent of contamination that it knew or suspected was present throughout HPNS.  It understated the human risk at HPNS, and failed to warn the City of the risk to its employees who were working at HPNS.

*Abbey* Complaint ¶¶ 21–23 (emphasis added).

And, the *Jahr* Complaint likewise alleges liability outside of the 2012 admissions of Rolfe and Hubbard.  *See Jahr* Complaint ¶ 92 (alleging that "Tetra Tech's soil sampling fraud was more widespread in time and place than previously known).  For example, the complaint's introduction alleges: "**From 2003** through 2014, Tetra Tech entered into a series of contracts with the United States Navy to provide radiological remediation services at Hunters Point."  *Jahr* Complaint ¶ 4 (emphasis added).  "During the period between **at least June 2006** and January 2018, Tetra Tech submitted, or caused to be submitted, materially false claims to the Navy for fraudulent testing and reporting at Hunters Point, and made, or caused to be made, material false statements to the Navy in connection with the fraudulent testing and reporting."  *Jahr* Complaint ¶ 6 (emphasis added).

27

Later on, when discussing Tetra Tech's alleged conduct, the *Jahr* complaint alleges:

**At all times relevant to this Complaint**, Tetra Tech contracted with New World Technology, Inc., or Radiological Survey & Remedial Services, Inc., to provide Radiological Control Technicians ("RCT") to work on the radiological investigation and remediation of Hunters Point. Tetra Tech managers, including Stephen Rolfe and Justin Hubbard, supervised crews of RCTs who were collecting soil samples and conducting building scans in [relevant areas].

William Dougherty was the Project Manager for Tetra Tech between on or about **March 1, 2006** and early 2014. Daughter worked on-site at Hunters Point, and was responsible for managing all aspects of Tetra Tech's work. Dougherty had daily contact with, and gave direction to, Rolfe and Hubbard.

**At all times relevant to the complaint**, Dennis McWade was a Construction Manager for Tetra Tech at Hunters Point. McWade worked on-site at Hunters Point, and was responsible for managing the crews performing radiological surveys and remediation at Hunters Point for Tetra Tech. McWade had daily contact with, and gave direction to, Rolfe and Hubbard.

**At all times relevant to the complaint**, Rick Weingarz was employed by Tetra Tech as an Assistant Project Manager at Hunters Point. Weingarz worked on-site at Hunters Point, and was responsible for managing the crews performing radiological surveys and remediation at Hunters Point for Tetra Tech. Weingarz had daily contact with, and gave direction to, Rolfe and Hubbard.

Andrew Bolt, who has been Tetra Tech's President since on or about July 2014, served as Tetra Tech's Senior Vice President, Remediation and Program Manager, **from 1994** until 2014. Bolt, who was Dougherty's boss, provided Dougherty with monthly financial reports regarding Tetra Tech's profits from its contracts to perform remediation work at Hunters Point.

Rolfe, Hubbard, Dougherty, McWade, Weingarz and Bolt were each employed by Tetra Tech EC in a managerial capacity **at all times relevant to this Complaint**, and each of them was acting within the scope of employment **at all times relevant to this Complaint**.

Tetra Tech's fraud was initiated and directed by Tetra Tech's corporate managers, including, but not limited to, Dougherty, Weingarz, McWade, Rolfe, and Hubbard.

*Jahr* Complaint ¶¶ 77–83 (emphasis added). The language of the complaints therefore clearly alleges fraud within the time period covered by the policies, and each complaint explains that the claims arise out of that alleged fraud. *Contra* Transcript 15:16–23 ("[T]here's no allegation that any fraudulent conduct occurred during the AIG policies. It is impossible for either environmental damage or bodily injury to have occurred during the AIG policies arising out of fraudulent

conduct.  There is no allegation that enables us to come to that conclusion.").

There is, therefore, no dispute of material fact that the claims "aris[e] out of . . . fraudulent, criminal, or malicious act[s] or omission[s], or those of a knowingly wrongful nature committed intentionally by or at the direction of an Insured."  Exclusions [Dkt. No. 61-1] at 3.  Had the claims asserted Pollution Conditions that were "unexpected or unintended" and therefore triggered AIG's duty to defend, AIG would have been precluded from any defense obligation by Exclusion A.

### B.    Exclusion J

The CERCLA claims alleged in *Jahr* would additionally be excluded by Exclusion J.  Exclusion J precludes coverage of "[a]ny Claim arising out of the cost to repair or replace faulty workmanship, assembly, construction, erection, fabrication, installation or remediation if such work is performed in whole or in part by . . . an Insured."  Exclusions [Dkt. No. 61-1] 4.  The *Jahr* Complaint states:

> This action also concerns Tetra Tech's liability pursuant to Section 107(a) of CERCLA for costs incurred by the United States to address the release or threat of release of hazardous substances at the Site.  Tetra Tech's unreliable sampling and other activities at the Site left the Navy under a legal obligation to **re-do** the work at those portions of the Site where Tetra Tech had previously been performing the radiological waste response activities, ("**Rework**").  The CERCLA cause of action seeks recovery of costs currently being spent, as well as those costs that will be spent in the future by the United States for this **repeat response action** addressing radionuclides at the Site.

*Jahr* Complaint ¶ 2 (emphasis added).  Throughout the Complaint, plaintiffs in *Jahr* reference the "Rework" aspect of the CERCLA claim.  *See, e.g.*, *Jahr* Complaint ¶ 1 ("the Navy continues to spend enormous sums of money to check, and where necessary re-do, Tetra Tech's work."), ¶ 73 ("Tetra Tech's placement of contaminated samples into open trenches, its unreliable sampling and analyses, and its use of unreliably tested soils as fill at the Site resulted in radionuclides coming to be located at various locations at the Site and required the Navy to undertake a second investigation and cleanup at the Site, (*i.e.*, the Rework)."), ¶ 177 ("Tetra Tech is liable to the

1    United States for all response costs, with interest, incurred in connection with soil in the

2    Rework.").

3         Tetra Tech first argues that Exclusion J cannot apply because "the Government seeks

4    response costs for new releases, not repairing or replacing 'faulty remediation.'"  TT MSJ 28–30.

5    It argues that "Clean-Up Costs," pursuant to Coverage B, are covered and that the United States

6    seeks relief for these Clean-Up Costs due to "new" Pollution Conditions.  *See* TT MSJ 29 ("Such

7    expenses—essentially the cost of cleaning up contaminated soil—are precisely what the U.S.

8    seeks to recover from TtEC in *Jahr*."); *see also* TT Oppo. MSJ 32 ("They are Clean-Up Costs . . .

9    relating to alleged new releases of hazardous substances at HPNS allegedly resulting from TtEC's

10   Covered Operations.").

11

12        This argument ignores that "Clean-Up Costs," defined by the policies as "reasonable and

13   necessary expenses . . . incurred in the investigation, removal, remediation (including the

14   associated monitoring) or disposal of soil, surface water, groundwater, or other contamination . . .

15   to the extent required by Environmental Laws; or . . . which have been actually incurred by the

16   government," differs from what is excluded by Exclusion J—the "cost to repair or replace faulty . .

17   . remediation."  Exclusions [Dkt. No. 61-1] 4.  In other words, there can be (1) Pollution

18   Conditions that were "unexpected and unintended" from Tetra Tech's standpoint that would need

19   to be cleaned up and afforded by AIG pursuant to the Clean-Up Costs provision, or (2) Pollution

20   Conditions that were "unexpected and unintended" from Tetra Tech's standpoint that were the

21   result of "faulty remediation" and require the remediation to be redone.  As is made clear by the

22   contents of the *Jahr* Complaint, the United States here claims the latter.[12]

23

24        Tetra Tech next contends that the language of Exclusion J "suggests that its intent is to

25   eliminate coverage for the cost of repairing or replacing the insured's faulty construction or

26

27   _____

28   [12] Tetra Tech's argument also ignores that the "threatened releases" it refers to as "new Pollution
     Conditions" are the alleged *result* of the faulty workmanship and remediation in the first place.

United States District Court
Northern District of California

remediation work on an *object or product*" as opposed to faulty remediation *services*.  TT MSJ 34 (emphasis in original).  In support, it cites to *Allstate Insurance Company v. Smith*, a case concerning a property insurance policy (as distinct from a third-party liability policy as is at issue here), and a Tenth Circuit case where the court held the duty to defend for the insurer in that case extended to professional services on behalf of the insured, despite the faulty workmanship exclusion.  TT MSJ 34–35.  I briefly address, and dismiss as irrelevant, both cases.

In *Allstate*, Mr. Smith purchased an "all risk" insurance policy to cover "his business property for 'loss or damage resulting from direct physical loss'" from Allstate Insurance Company.  929 F.2d 447, 448 (9th Cir. 1991).  During a roof reconstruction on his building, a contractor removed most of the roof during the day, but did not cover the roof after leaving for the evening.  *Id.* at 449.  That night, it rained directly into Mr. Smith's office—damaging his business property.  *Id.*  Allstate attempted to evade its duty to defend pursuant to the "faulty workmanship" clause of the insurance policy but the Ninth Circuit held that "the exclusion [did] not apply because Smith's losses were not caused by a flawed product, but by failure to protect the premises during the roof repair process."  *Id.* at 450.

The type of policy before me "is neither a performance bond nor an all-risk policy." *Diamond Heights Homeowners Assn. v. Nat'l Am. Ins. Co.*, 227 Cal. App. 3d 536 (1991).  It requires a different analysis with respect to the Policy as a whole.  Here, there is no "object or product" at issue in the Policy.  The Policy provides third party Contractor's Pollution Liability Coverage, except for those issues that impact third parties as laid out by the exclusions.  And Exclusion J clearly excludes "the cost to repair or replace faulty . . . workmanship . . . or remediation" from coverage.

Tetra Tech cites another case, *Rockhill Insurance Company v. CFI-Global Fisheries Management,* for its contention that the "words in the body of the exclusion are more naturally read as relating to construction, rather than professional environmental testing and clean up

31

services." 782 Fed. App'x. 667 (10th Cir. 2019); TT MSJ 36. In *Rockhill*, contracting company CFI-Global Fisheries Management acquired a professional liability insurance policy from Rockhill Insurance Company. 782 Fed. App'x. at 669. Exclusion M of the policy at issue precluded a duty to defend for any injury "[b]ased upon, arising out of or for any loss, cost or expense incurred to withdraw, recall, inspect, repair, replace, adjust, remove or dispose of 'your work.'" *Id.* The district court held that Exclusion M's reference to "your work" referred both to design and construction claims. *Id.* at 671. The Tenth Circuit reversed, holding that "the Faulty Workmanship exclusion was not intended to cover design failings" given the full context of the policy. *Id.* In that case, the context of the policy supported an understanding that Exclusion M covered only construction components of CFI-Global Fisheries' work.

In sum, the context of the Policy here supports an understanding that Exclusion J excludes coverage for the costs to "repair or replace faulty . . . remediation" done at least in part by TtEC. There is simply no other way to understand the exclusion. And since that is what the United States seeks (coverage for the "Rework"), Exclusion J precludes AIG from covering those costs.

Exclusion J also precludes coverage of any "faulty workmanship . . . or remediation" if the work is performed by "any organization, or subsidiary or affiliate thereof, which an Insured controls, manages, operates or holds more than a 25% ownership interest in, or which controls, manages, operates or holds more than a 25% ownership interest in an Insured." Exclusions [Dkt. No. 61-1] 4. Tetra Tech finally argues that because its subcontractor, New World Technologies, Inc. ("New World") also worked on the Site to provide "radiological characterization/survey support, NRCP Type A Broad Scope License oversite, radiological safety program oversight, on-site laboratory, and Nrc Low-Level Radioactive Waste . . . custody oversite . . . among other services," there is a material dispute of fact concerning whether the allegations in the *Jahr* Complaint can be attributed to TtEC as opposed to New World. TT MSJ 33–34. It does not matter. The policy clearly precludes coverage of claims due to shoddy work "performed in whole

or **in part by**" Tetra Tech.  And, the *Jahr* Complaint alleges that "[a]t all times relevant to th[e]

Complaint," Tetra Tech managers (Dougherty, Weingarz, McWade, Rolfe, and Hubbord, among

others) supervised New World employees.  *Jahr* Complaint ¶¶ 77–83.  The fault of the need for

"Rework," according to the Complaint, lies with Tetra Tech.

For all of these reasons, Exclusion J would have prevented AIG's duty to defend from

attaching, had the claims come under Coverage B of the policy in the first instance.

### C.    Exclusion S

I briefly address Exclusion S.  AIG argues that Exclusion S additionally applies, barring

coverage for each of the three lawsuits.  Exclusion S precludes coverage for:

> [a]ny **Claim** in connection with any real property or facility which is, or was at any time, owned, operated or rented by the **Named Insured** or by any entity that . . . (1) wholly or partly owns, operates, manages, or otherwise controls the **Named Insured;** or is wholly or partly owned, operated, managed, or otherwise controlled by the **Named Insured**.

Exclusions [Dkt. No. 61-1] at 5.  AIG contends that the *Abbey*, *Bayview*, and *Jahr* lawsuits are "in

connection with" HPNS, and that Tetra Tech "operated" the Site within the meaning contemplated

by the Policy.  In support of its argument, AIG points to language from a 2005 contract between

Tetra Tech and the United States.  AIG MSJ 25.  Under the services provision of the Scope of

Work, the contract explains that Tetra Tech is to, in part, "provid[e] facility operation,

maintenance and instruction."  Schroeder Decl. Exh. 2 [Dkt. No. 71] at 74.  It is far from clear

from that language that at any point did the United States hand full control to Tetra Tech to

operate HPNS.  Given the general reluctance of the government to relinquish control of its military

operations or adjacent activities, it seems highly improbable that it did so in this case.  And,

language throughout that contract tends to suggest the opposite.  *See* Exh. 2 [Dkt. No. 71] at 78, 89

(requiring field consultations).

Had the claims come within the scope of Coverage B, Exclusion S would not have

precluded AIG's duty to defend. [13]

## CONCLUSION

The *Abbey*, *Bayview*, and *Jahr* Complaints do not compel AIG's defense obligation. And, had the claims within those complaints come within the coverage of the policies, Exclusion A would have excluded AIG's duty to defend for each case, and Exclusion J would have excluded AIG's duty to defend in *Jahr*. TtEC's Motion for Summary Judgment is DENIED and AIG's Motion for Summary Judgment is GRANTED. AIG does not owe Tetra Tech a duty to defend in *Abbey* and *Bayview* and does not owe TtEC a duty to defend in *Jahr*.

It appears that the only open issue in this case is the amount of reimbursement to which AIG is entitled. The parties shall meet and confer about that issue and whether they can agree on a form of judgment or whether they request a Case Management Conference to discuss the remaining issues. If either party desires a Case Management Conference, it will be held on September 30, 2025, at 2:00 PM. The Joint Case Management Conference Statement shall be filed on September 23, 2025.

**IT IS SO ORDERED.**

Dated: August 25, 2025



William H. Orrick
United States District Judge

---

[13] In its Reply, AIG moves to strike a portion of a declaration and exhibit submitted by Tetra Tech in support of its arguments concerning Exclusion S in opposition to AIG's motion. *See* AIG Reply MSJ 3. The declaration refers to "Interrogatory No. 18," but the Exhibit the declaration refers to does not include that interrogatory. *See* Odia Decl. [Dkt. No. 75] ¶ 6, Exh. B [Dkt. No. 75-2]. I therefore do not (and cannot, since it is not included) rely on this information and decline to rule on AIG's evidentiary objection.